UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| MARTIN ARTIANO<br>14265 Burns Way<br>Saratoga, CA 95070-5804<br><br>ECCETTS, LTD.<br>c/o Trident Trust<br>P.O. Box 847<br>Cayman Islands, BWI,<br><br>B.Z. KEILANI, II<br>P.O. Box 99312<br>Troy, MI 48099,<br><br>           Plaintiffs,<br><br>           v.<br><br>PHILIP WEINTRAUB<br>104 Monterey Pointe Dr.<br>Palm Beach Gardens, FL 33418<br><br>GFS HOLDINGS CO.<br>104 Monterey Pointe Dr.<br>Palm Beach Gardens, FL 33418<br><br>GFS MERGER CO.<br>104 Monterey Pointe Dr.<br>Palm Beach Gardens, FL 33418<br><br>    - and -<br><br>AURUM TECHNOLOGY, INC.<br>2701 W. Plano Parkway<br>Suite 600<br>Plano, TX  75075<br><br>           Defendants. | 01-2103<br><br>CIV-HIGHSMITH<br><br><br>MAGISTRATE JUDGE<br>        GARBER<br><br><br><br>Civil Action No. _____<br><br><br><br><u>JURY TRIAL DEMANDED</u> |

1

DC01:306597.2

## COMPLAINT FOR MONEY DAMAGES

1.  This is an action to redress the most severe type of corporate misconduct imaginable: the theft of one company's assets and opportunities by a member of management to generate millions of dollars worth of benefits for himself, his other companies, and their "insider" shareholders while leaving the original company's founding shareholders penniless.

## PARTIES

2.  Plaintiff Martin Artiano is an individual citizen of the State of California. Artiano was one of the founders and original shareholders of Global Electronic Financial Services, LLC ("GEFS"), the corporate entity whose assets and opportunities were stolen by defendants.

3.  Plaintiff B. Z. Keilani, II, is an individual citizen of the State of Michigan. Keilani was one of the founders and original shareholders of GEFS.

4.  Plaintiff ECCETTS, Ltd. is a corporation organized under the laws of the Cayman Islands. In or about February 1998, Keilani assigned and transferred his membership interest in GEFS to ECCETTS, Ltd.

5.  Defendant Philip Weintraub is an individual citizen of the State of Florida. Throughout the time period relevant to the claims at issue herein, Weintraub was a consultant for and then later the Chief Executive Officer of GEFS, positions of trust he abused for his own personal gain at the expense of that company's founding shareholders.

6.  GFS Holdings Co. ("GFS") is a corporation organized by Weintraub under the laws of the State of Delaware. Weintraub served as President and CEO of GFS. GFS maintained its principal place of business in the State of Florida.

GFS was the corporate vehicle into which Weintraub unlawfully diverted the assets and opportunities of GEFS.

7. GFS Merger Co. is a corporation organized under the laws of the State of Delaware. GFS Merger Co. maintained its principal place of business in the State of Florida. GFS Merger Co. was a corporate vehicle into which Weintraub transferred GFS in an effort to distance GFS from GEFS prior to Weintraub's ultimate disposition of that company's assets and opportunities.

8. Defendant Aurum Technology, Inc. is, upon information and belief, a corporation organized under the laws of the State of Delaware. Aurum maintains its principal place of business in the State of Texas. On January 16 of 2001, Weintraub merged GFS into Aurum.

## JURISDICTION

9. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. Section 1332(a)(1) because the plaintiffs and the defendants are citizens of different states, and the amount in controversy between them exceeds $75,000.

## VENUE

10. Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(a)(2) because a substantial number of the acts giving rise to the claims transpired in this judicial district.

## FACTS

11. On October 31, 1996, plaintiff B.Z. Keilani formed a Delaware company called Phoenicia Group, LLC for the purpose of developing new technology for a global electronic financial services utility.

12.     On February 21, 1997, Keilani, Joseph M. Fischer, Artiano, and Raymond J. Stewart executed a letter agreement to work together to develop this new technology and utility. To that end, Keilani agreed to "cause the ownership of all the intellectual property rights associated with or resulting from the [development of the new technology and utility] to be transferred to Phoenicia," and the four individuals agreed to share ownership interests in Phoenicia according to the following percentages: Keilani – 90%; Fischer – 3%; Artiano – 4%; and Stewart – 3%.

13.     On February 28, 1997, Global Electronic Financial Services, Inc. ("GEFSCORP") was formed as a subsidiary of Phoenicia for the purpose of operating new technology for a global electronic financial services utility.

14.     In February 1997, GEFSCORP hired Weintraub as a strategic planner and industry analyst. Before he was hired, Weintraub was required to sign a non-disclosure agreement, protecting the technology and other intellectual property from disclosure to third parties.

15.     On April 18, 1997, Sun Microsystems endorsed a strategic alliance with GEFSCORP for the development of the new technology and utility.

16.     In the summer of 1997, a leading technology group in Europe (Adnovum Software, A.G.) issued a secondary technical "white paper," which strongly endorsed the conceptual designs for this new technology and utility.

17.     In June of 1997, under the direct supervision of Artiano, after months of hard work involving as many as eighteen engineers, and at a cost of $750,000, the technical architecture and business plan for the new technology and utility – key intellectual property assets – were completed. Among other things, the June 1997

business plan specifically identified a number of financial services providers – including Gateway Financial Services, Inc. and Online Financial Services, Inc. – as potential acquisitions.

18. On July 31, 1997, GEFS, LLC ("GEFS") was incorporated in the State of Delaware to become the corporate entity devoted to acquisition of financial services support and to fundraising for the development of this global electronic financial services technology and utility.

19. On October 14, 1997, Keilani, Fischer, Artiano, and Stewart exchanged their ownership interests in Phoenicia for ownership interests in GEFS according to the following percentages: Keilani – 77.6%; Fischer – 5.82%; Artiano – 7.76%; and Stewart – 5.82%. The remaining 3% ownership interest was given to WTM, Weintraub's personal corporation. Simultaneously, Keilani promised to cause all of the U.S. intellectual property and other legal rights in the new technology and utility to be licensed to GEFS, and he subsequently did so.

20. On October 14th as well, the parties made Weintraub the CEO of GEFS. As part of the consideration for undertaking this new position, Weintraub's company, WTM, was given an additional 10% ownership interest in GEFS (through corresponding 10% pro rata reductions in the ownership interests of the other shareholders).

21. In or about late 1997 or early 1998, Weitraub said that he was unhappy with the size of Keilani's equity stake in GEFS and intended to do whatever he could to reduce Keilani's equity.

22.  For the next several months, Weintraub used his power as CEO to run GEFS in a closely controlled and secretive manner, sharing hardly any details of the company's operation with its founding shareholders. In the Spring of 1998, Keilani – as the majority shareholder of GEFS – substantially increased his complaints about the lack of information Weintraub was providing to the founding shareholders.

23.  At the request of Keilani, Weintraub sent Keilani and the other GEFS shareholders a document entitled "GEFS Executive Business Plan" in an effort to stem the complaints about missing information. The Executive Business Plan contained bold projections of an extremely profitable business future for GEFS, but provided little in the way of operational details about the company for the prior six months. As a result, on April 24, 1998 and on numerous occasions thereafter, Keilani wrote to Weintraub complaining about being left in the dark by Weintraub about the operations at GEFS.

24.  In late June of 1998, in another attempt to quell shareholder complaints about the lack of information being provided to them, Weintraub informed Keilani and others that GEFS would be holding a shareholders meeting later that summer in Pennsylvania. By Notice dated July 17, 1998, Weintraub invited all GEFS shareholders to attend that "Special Meeting."

25.  The GEFS Shareholders Meeting was held on August 17, 1998 in Media, Pennsylvania. The agenda for, and discussion at, the meeting was tightly controlled by Weintraub, who actually employed private security guards to ensure his control of the meeting. At the meeting two significant things were said, and another even more important thing was not said, by Weintraub. <u>First</u>, Weintraub informed the GEFS shareholders at the meeting that GEFS had negotiated and executed a "definitive

agreement" to acquire a substantial financial services company, but Weintraub refused to name that company, citing confidentiality concerns. Upon information and belief, the definitive agreement was between GEFS and the owners of Gateway Financial Services. Second, Weintraub advised the shareholders that GEFS had approximately $630,000 in the bank; but today GEFS has no such assets and the founding shareholders, including plaintiff, have no idea where that money went. Third, Weintraub never said anything to the GEFS shareholders at the meeting about any plans to form a new, related company called GFS Holdings Co.

26. Just two days after the meeting, on August 19, 1998, Weintraub caused GFS Holdings Co. ("GFS") to be incorporated in the State of Delaware. The Certificate of Incorporation for GFS indicates that Weintraub caused the company to be authorized to issue up to 1,500,000 shares of stock at a par value of one cent per share.

27. Just seven days later, on August 26, 1998, GFS issued a Private Placement Memorandum ("PPM") in an effort to solicit investors to purchase securities in that new company. Weintraub "invited" certain existing GEFS shareholders to become shareholders in GFS at a price of ten dollars per share (in an amount up to the number of shares they held in GEFS). Although the PPM was sent to selected GEFS shareholders – by regular mail from the GFS address in Florida – on August 26th, the GEFS shareholders were only given until September 7, 1998 to take advantage of Weintraub's "invitation" to buy GFS stock.

28. In a cover memorandum to GEFS shareholders with the PPM, Weintraub described GFS as "a subsidiary" of GEFS. The text of the PPM also further

indicated that "GFS has been formed to further the implementation of GEFS' Business Plan."

29. In conjunction with the GFS PPM, Weintraub also prepared and circulated a document entitled "GFS Holdings Co. Executive Business Plan." This business plan was identical in all material respects to the business plan previously developed for GEFS.

30. Thereafter, Weintraub caused GEFS to license all of its intellectual property and other legal rights in its new technology and utility to GFS, in violation of both the underlying licensing agreement allowing GEFS to use the technology in the first instance and of his fiduciary duties to GEFS and its shareholders.

31. Thereafter, Weintraub diverted the acquisition of the financial services company discussed at the GEFS Shareholders Meeting to GFS, away from GEFS.

32. Thereafter, for the next year or so, Weintraub operated GFS consistent with the GEFS business plan, using GEFS' assets. During this time period, GFS contracted to acquire at least two other financial services companies, an action consistent with GEFS's business plan. Weintraub did nothing to further the growth or development of GEFS. To the contrary, Weintraub actually destroyed the growth of GEFS, which had a business valuation of $30 million in March of 1998 but today would be valued as worthless.

33. In or about February 2000, Keilani met with Weintraub in Florida. At that time, Weintraub gave Keilani a power-point presentation on GFS. Weintraub did not disclose, however, that he had diverted the assets of GEFS to GFS.

34. On May 12, 2000, Weintraub and others caused GFS Merger Corporation to be incorporated in the State of Delaware.

35. In December of 2000, Weintraub signed an agreement to merge GFS into Aurum.

36. On or about January 16, 2001, Weintraub and Raymond Maturo, CEO of Aurum, merged GFS into GFS Merger Corporation, then immediately changed the name of the succeeding corporation back to GFS Holdings Co. On the same day, they concluded the merger of GFS Holdings Co. into Aurum. Upon information and belief, upon the merger, Aurum became subject to all the liabilities of GFS and GFS Merger.

37. Upon information and belief, Weintraub, his companies, and their "insider" shareholders received many millions of dollars worth of cash, stock, stock options, and other economic benefits as a result of the merger of GFS into Aurum. <u>The founding shareholders of GEFS received nothing from the merger</u>. Indeed, the founding shareholders of GEFS have been so completely frozen out of the business by Weintraub that they have not even been informed about the details of GFS' merger into Aurum.

## COUNT ONE
## BREACH OF FIDUCIARY DUTIES

38. Plaintiffs incorporate herein the full text of paragraphs 1 through 37 above as if restated in full.

39. As the chief corporate officer of GEFS and as a co-shareholder in GEFS (through WTM), Weintraub owes strict fiduciary duties of loyalty, disclosure, and good faith to the other shareholders of GEFS, including plaintiffs.

40. For the benefit of himself and the corporate defendants, Weintraub breached each and every one of these fiduciary duties he owed to plaintiffs in at least the following respects:

(a) Weintraub failed to disclose his plans to form GFS, and lied about the reasons for forming that Company by maintaining that it was done to further the business development of GEFS.

(b) Weintraub structured the timing and pricing of his "invitation" for existing GEFS shareholders to purchase stock in GFS in a manner designed to discourage the founding shareholders from purchasing any GFS stock, in order to wash them out of his new corporation.

(c) Weintraub deprived GEFS of valuable corporate assets by licensing all of GEFS' intellectual property and other legal rights in its new technology and utility to GFS, and by using GEFS' assets to support the operation of GFS.

(d) Weintraub deprived GEFS of valuable corporate opportunities by diverting the acquisition of the financial services company discussed at the August 1998 GEFS Shareholders Meeting to GFS, and by similarly placing subsequent corporate acquisitions into GFS rather than GEFS.

(e) From August 19, 1998 onward, Weintraub ran the business of GFS in direct competition with – and at the direct expense of – what should have been the developing business plan of GEFS.

(f) Weintraub acted in bad faith by placing his own personal financial interests – and those of his companies and their "insider" shareholders – in GFS ahead of the interest of the remaining shareholders of GEFS.

41. Plaintiffs have been severely damaged by Weintraub's breach of these fiduciary duties, whereas all of the defendants have knowingly participated in and substantially benefited from Weintraub's misconduct. While Weintraub and the corporate defendants have participated in transactions yielding many millions of dollars worth of economic benefits, plaintiffs have been left behind as shareholders of GEFS, which has been looted of virtually all of its assets. In March of 1998, GEFS had a valuation of $30 million; today it would be valued as worthless.

## COUNT TWO
## USURPATION OF CORPORATE OPPORTUNITIES

42.     Plaintiffs incorporate herein the full text of paragraphs 1 through 41 above as if restated in full.

43.     As the chief corporate officer of GEFS, Weintraub owed GEFS and its shareholders an obligation to pursue available corporate opportunities for the benefit of GEFS and not to divert such opportunities for the benefit of himself or any third parties.

44.     For the benefit of himself and the corporate defendants, Weintraub blatantly violated this obligation after August 19, 1998, by repeatedly acquiring assets and pursuing opportunities in the name of GFS, in which Weintraub had a greater interest, that should have been acquired and pursued in the name of GEFS. At the end of the day, this included the opportunity to participate in the merger with Aurum.

45.     Plaintiffs have been severely damaged by Weintraub's repeated violation of this obligation, whereas all of the defendants have substantially benefited from Weintraub's misconduct. While Weintraub and the corporate defendants have participated in corporate opportunities yielding many millions of dollars worth of economic benefits, plaintiffs have been left behind to remain as shareholders of GEFS, which has been deprived of its rightful chance to participate in any of those opportunities to its great economic detriment.

## COUNT THREE
## FRAUD

46.     Plaintiffs incorporate herein the full text of paragraphs 1 through 45 above as if restated in full.

47. As the chief corporate officer of GEFS and as a co-shareholder in GEFS (through WTM), Weintraub held a position of trust with respect to the remaining shareholders of GEFS.

48. For the benefit of himself and the corporate defendants, Weintraub regularly abused his position of trust by making repeated misrepresentations to the shareholders in GEFS and to the solicited share purchasers in GFS about the true nature of GFS and its activities and by failing to disclose material information about the operations and assets of GEFS and GFS. While GFS was originally portrayed by Weintraub as a "subsidiary" of GEFS which was being formed to further GEFS' business development, in fact GFS was a corporation established to hold the diverted assets and opportunities of GEFS for Weintraub's own benefit.

49. In knowingly making these and other misrepresentations and omissions about the true nature of GFS and its activities, Weintraub committed fraud.

50. Plaintiffs have been severely damaged by the frauds committed by Weintraub, whereas all of the defendants have substantially benefited from Weintraub's fraudulent misconduct. Weintraub's knowing material misrepresentations and omissions have allowed him and the corporate defendants and their insider shareholders to participate in transactions yielding many millions of dollars worth of economic benefits. If the truth had been told, plaintiffs – as shareholders of GEFS – would have participated in those transactions themselves and reaped the same benefits instead of being left behind.

DC01:306597.2

## COUNT FOUR
## CONVERSION

51. Plaintiffs incorporate herein the full text of paragraphs 1 through 50 above as if restated in full.

52. The assets of GEFS, including the architecture and business plan developed in 1997, belonged to plaintiffs, according to individual percentages, by virtue of their membership in GEFS and their ownership thereof.

53. By virtue of his status as CEO of both GEFS and GFS, Weintruab knew of plaintiffs' ownership interests in the intellectual property of GEFS.

54. Intentionally and without authorization, Weintraub and GFS deprived plaintiffs of the value of their property interest in GEFS by transferring the substantive assets of GEFS to GFS and then merging GFS with Aurum through GFS Merger Co. and thus diluted or eliminated plaintiffs' interest in and control over their rightful property.

55. At the time of filing of this complaint, plaintiffs' property remained out of their control as it had passed through GFS Holdings Co. and GFS Merger Co. to Aurum.

56. Plaintiffs have been severely damaged by this deprivation committed by Weintraub and GFS, whereas all of the defendants have substantially benefited from this misconduct. While Weintraub and defendant corporations have made many millions off of the stolen intellectual property, plaintiffs have been left behind as shareholders in a worthless company robbed of its assets.

## COUNT FIVE
## MISAPPROPRIATION OF TRADE SECRETS

57.   Plaintiffs incorporate herein the full text of paragraphs 1 through 56 above as if restated in full.

58.   The business plan and technical white paper that were developed by Keilani, Phonecia and the founding shareholders of GEFS, including plaintiffs, were key intellectual property that was then used by Weintraub and others to develop business in GFS which was of sufficient value to be of interest to Aurum and to provide GFS shareholders with millions of dollars in profits from the Aurum merger.

59.   Prior to the unauthorized removal of these assets from GEFS, plaintiffs took significant steps to safeguard the secrecy of this intellectual property, including requiring Weintraub and others to sign a non-disclosure agreement, applying for a U.S. Patent, and not revealing the plans to individuals who were not either in their employ or otherwise necessary to the development of the plan.

60.   In his capacity as a fiduciary to GEFS and its founding shareholders, Weintraub had a duty to protect the intellectual property as a trade secret.

61.   Weintraub's removal of the trade secrets from GEFS, accomplished with the assistance of other shareholders in GFS and ultimately Aurum as well, was both a violation of his duty of loyalty and the missapropriation of a protectable trade secret.

62.   Defendants' misappropriation was both willful and malicious and was committed in bad faith.

63.   Plaintiffs have been severely damaged by this misappropriation committed by Weintraub, GFS, and others, whereas all of the defendants have

substantially benefited from this misconduct. While Weintraub and defendant corporations have made many millions off of the stolen intellectual property, plaintiffs have been left behind as shareholders in a worthless company robbed of its assets.

## COUNT SIX
## CIVIL CONSPIRACY

64. Plaintiffs incorporate herein the full text of paragraphs 1 through 63 above as if restated in full.

65. Weintraub, defendant corporations, and others acted in concert to breach Weintraub's fiduciary duties, usurp corporate opportunities, commit fraud, and convert and misappropriate property for their own profit.

66. Plaintiffs have been severely damaged by this pattern of misconduct, whereas all of the defendants have substantially benefited from it. While Weintraub and the corporate defendants have participated in corporate opportunities yielding many millions of dollars worth of economic benefits, plaintiffs have been left behind to remain as shareholders of GEFS, which is now essentially worthless.

## COUNT SEVEN
## SUCCESSOR LIABILITY
### (against Aurum only)

67. Plaintiffs incorporate herein the full text of paragraphs 1 through 66 above as if restated in full.

68. Aurum is the successor corporation to GFS and GFS Merger.

69. Upon the merger of GFS and GFS Merger into Aurum, Aurum succeeded to all the liabilities of GFS and GFS Merger.

70. Aurum is, therefore, liable to plaintiffs for damages that were caused by the misconduct of GFS and GFS Merger as well as their principals.

WHEREFORE, on the basis of the foregoing premises, plaintiffs demand judgment against defendants as follows:

(i) for judgment against the defendants on all Counts of the Complaint;

(ii) for an Order requiring the defendants to provide a full accounting from January 1, 1998 forward of all financial transactions engaged in by, or affecting, GEFS, GFS, GFS Merger Co., and Aurum (after the date of its merger with GFS), so that plaintiffs can determine the full extent of the financial fruits of defendants' wrongdoing;

(iii) for an award of compensatory damages and/or unjust enrichment sufficient to make the plaintiffs whole for the full extent of the economic harm they have suffered at the hands of the defendants and to deprive defendants of their unlawful gains;

(iv) for exemplary damages pursuant to Fla. Stat. § 688.004 because defendants' conduct was willful, malicious, and in bad faith;

(v) for an award of punitive damages in an amount equal to five times the value of the compensatory damages requested in order to punish the defendants for their blatant, intentional, and malicious disregard of the plaintiffs' legal rights;

(vi) for attorney fees, costs, and interest;

(vii) for such other and further relief as the Court deems just and proper.

DC01:306597.2

Respectfully submitted,

_____
STEPHEN L. BRAGA
stephen.braga@bakerbotts.com
ELLEN F. BERKMAN
ellen.berkman@bakerbotts.com
REBECCA H. EWING
rebecca.ewing@bakerbotts.com
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
(202) 639-7700


- and -

_____
IRMA SOLARES
Florida Bar No. 797073
is@jordenusa.com
JORDEN BURT LLP
777 Brickell Ave., Suite 500
Miami, FL 33131
(305) 371-2600

December 24, 2001                   Counsel for Plaintiffs

17

DC01:306597.2

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

01-9103

## I. (a) PLAINTIFFS
MARTIN ARTIANO
ECCETTS, LTD.
B.Z. KEILANI, II

## DEFENDANTS
PHILIP WEINTRAUB
GFS HOLDINGS CO.
GFS MERGER CO.
AURUM TECHNOLOGY, INC.

CIV-HIGHSMITH

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Saratoga, CA**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Palm Beach, FL**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE
GARBER

A-Palm Beach 01-9103 CIV SH Garber

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Jorden Burt LLP
777 Brickell Avenue, Suite 500
Miami, FL 33131   (305) 371-2600

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, BROWARD, **PALM BEACH**, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | **PERSONAL PROPERTY** | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☒ 370 Other Fraud | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | B☐ 690 Other | **A LABOR** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | | ☐ 710 Fair Labor Standards Act | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | | | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | **B SOCIAL SECURITY** | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | A☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | **FEDERAL TAX SUITS** | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | A OR B |
| | | B☐ 555 Prison Condition | | A☐ 871 IRS – Third Party 26 USC 7609 | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. § 1332. Fraud, usurpation of corporate opportunity, Breach of Fiduciary Duty, Conversion, Fla. Stat. § 688.001 et seq., conspiracy.

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE **N/A**   DOCKET NUMBER _____

DATE **12·24·01**

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # 854786   AMOUNT $150.00   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___